District of Maine

Case No: _____

AARON A. ALDRICH

    Plaintiff,

2025 SEP 29  P 3: 37

v.

ANDROSCOGGIN COUNTY JAIL, ANDROSCOGGIN COUNTY SHERIFF'S DEP'T,
CORRECTIONAL PSYCHIATRIC SERVICES, ERIC SAMSON, LANE FELDMAN, and
JEFF CHUTE, JORGE VELIZ, WENDY RIEBE, DEBRA SMITH, are being sued
in their individual and official capacities;

    Defendants

**COMPLAINT**

Pursuant to § 1983
of 42 U.S.C.

(w/ Jury Trial
Demand)

X
:
:
:
:
:
:
:
:
:
:
:
:
:
:
X

COMES NOW Plaintiff Aaron Aldrich *pro se* and hereby presents the following civil-rights Complaint and claims for compensatory and punitive damages, as follows:

## I.

1. This action places before the Court a lawsuit involving gratuitous and wanton deliberate indifference by Defendants, individually and collectively, to Plaintiff's serious medical needs. Which acts and omissions caused Plaintiff to acquire repeated soft-tissue and serious bone infections and resulted in protracted severe pain and mental anguish, *inter alia*, including but not limited to the consequent amputation of Plaintiff's left middle finger.

2. This Complaint alleges that Plaintiff was routinely denied access to adequate and competent medical care, treatment, and facilities; and that the jails and contracted medical staff repeatedly and willfully disregarded the obvious and known risks involved in providing adequate and

and timely care and treatment for serious medical needs, such as a diagnosed MRSA infection; those staff and officials failed to act or follow-up on the information given to them by both Plaintiff and another correctional facility regarding Plaintiff's active MRSA infection and medication provided to them to treat it, they also failed and refused to obtain essential medical records about Plaintiff's diagnosed active MRSA infection despite Plaintiff notifying numerous jail and medical staff of his MRSA infection immediately upon his arrival to ACJ and various times thereafter, those staff and officials also failed and refused to carryout physician and specialist ordered treatment, they failed and refused to provide Plaintiff with necessary emergency and specialty care and surgery in a timely manner, and those staff and officials failed to provide Plaintiff with necessary pain and antibiotic (and other) medications, medical equipment, and medical kits ordered by Plaintiff's surgeon.

3. The aforesaid acts and omissions, and policies and practices of the Defendants, individually and collectively, were knowing, deliberate, and intentional, and in complete disregard of the health and well-being of the Plaintiff, and that such acts, omissions, policies, and practices of the Defendants caused Plaintiff to acquire numerous soft-tissue and serious bone infections, which caused Plaintiff unnecessary protracted severe physical pain and suffering and mental anguish, and left Plaintiff permanently disfigured and nearly antibiotic resistant, among other injuries, owing to Defendants' repeated incompetent, untimely, and denials of necessary medical care for Plaintiff's serious medical needs.

4. Plaintiff Aldrich further alleges that Defendant Wendy Riebe, HSA subjected him to unlawful retaliation for complaining and filing grievances about the grossly inadequate medical care and treatment received by Defendants. Which retaliation involved, but was not limited to the discontinuation of Plaintiff's suboxone treatment.

PARTIES

5. Plaintiff Aaron A. Aldrich was at all times relevant an inmate in the custody of the Androscoggin County Jail ("ACJ").

6. Defendant Androscoggin County Jail is/was at all times relevant hereto a correctional facility located in Auburn, Maine and duly vested with the custody, care, and control of pre-trial detainees and sentenced inmates for the County of Androscoggin.

7. Defendant Androscoggin County Sheriff's Department ("ACSD") is/was at all times relevant hereto the duly organized law enforcement agency for the County of Androscoggin and is/was responsible for, inter alia, the oversight and supervision of ACJ staff and officials, including contracted medical providers. ACSD is/was also responsible for the administration of ACJ and health and well-being of those persons in the custody of the jail.

8. Defendant Correctional Psychiatric Services ("CPS") is/was at all times relevant hereto the contracted health care provider at ACJ and responsible for providing adequate medical care and treatment, inter alia, to the inmates at ACJ.

9. Defendants Eric Samson, Lane Feldman, and Jeff Chute are/were at all times relevant correctional administrators at ACJ and responsible for the overall health and well-being of the inmated confined at ACJ, including but not limited to ensuring that inmates at ACJ received adequate medical care and treatment by the jail's contracted healthcare provider and staff, and for ensuring that CPS maintained adequate medical staff and personnel to meet the healthcare needs of the inmates at ACJ. These defendants were also

responsible for ensuring that CPS, and its employees and agents, met all contractual requirements pursuant to the healthcare contract ACJ had with CPS.

10. Defendant Jorge Veliz is/was at all times relevant hereto the

11. Defendant Wendy Riebe, HSA is/was at all times relevant hereto employed by CPS to serve as the Health Services Administer at ACJ and was responsible for ensuring that the inmates confined at ACJ received adequate medical care and treatment, inter alia, including but not limited to the general oversight and supervision of medical staff and personnel at ACJ and ensuring that CPS maintained adequate staffing levels to meet the healthcare needs of the inmates of ACJ.

12. Defendant Debra Smith, RN is/was at all times relevant hereto employed by CPS as a nurse and was responsible for performing Plaintiff's "Intake medical screening" upon his arrival to ACJ from Rockingham County Jail. Defendant Debra Smith was informed by both Plaintiff and the correctional facility where he had been sent to ACJ from, that Plaintiff had an active MRSA infection and prescription antibiotic medication to treat it. Yet, despite this knowledge, Defendant Debra Smith failed to ensure that Plaintiff was able to continue receiving his prescribed antibiotics and failed to refer Plaintiff to a medical provider.

13. Each and all Defendants named herein acted under color of state law at all times relevant.

## FACTS

14 . Plaintiff Aaron Aldrich (hereinafter "Plaintiff" or "Aldrich") was arrested on or about 02/24/2023 by authorities in New Hampshire and brought to the Rockingham County Jail ("RCJ") in Salem, New Hampshire to await extradition to Maine.

15 . At the time of Plaintiff's arrest, Plaintiff had prescription medications on his person (which consisted of antibiotic medications prescribed by Central Maine Medical Center for Plaintiff's recent diagnosis of methicilin resistent Staph aureus ("MRSA").

16 . Plaintiff provided those prescription medications to RCJ medical staff during his intake and informed RCJ staff and medical personnel about his recent MRSA diagnosis and active infection.

17 . Upon information and belief, RCJ medical staff acknowledged the obvious serious medical need for Plaintiff Aldrich to receive his prescribed antibiotics to treat his MRSA infection as scheduled and without delay, which is the reason that RCJ medical staff immediately approved Plaintiff's prescription medications and promptly had Plaintiff seen by a qualified medical provider.

18 . While detained at RCJ, Plaintiff received constitutionally adequate medical care and treatment for his MRSA infection and other serious medical needs.

19 . However, commencing on or about 3/8/2023, Plaintiff Aldrich was extradited back to Maine to answer pending criminal charges out of Androscoggin County, inter alia, and brought to Androscoggin County Jail ("ACJ")

20 . At the time Plaintiff was booked into ACJ, he informed the intake nurse (Defendant

Debra Smith, RN) that he was on prescribed antibiotic medications for an active MRSA infection and that Rockingham County Jail staff and medical personnel had sent him to ACJ with prescription medications and documentation of such.

21. Defendant Debra Smith, RN performed a very brief and cursory "medical screening" on Plaintiff Aldrich and had him sign medical records release forms authorizing Correctional Psychiatric Services ("CPS"), and their employees or agents, to obtain Plaintiff's medical records from Rockingham County Jail and CMMC.

22. Defendant Debra Smith, RN told Plaintiff that there "may be a slight delay" in him receiving his prescribed medications that were sent with him to ACJ from Rockingham County Jail, because medical providers at ACJ would need to first approve the medications.

23. Plaintiff Aldrich had been to ACJ in the past and knew from personal experience that the medical personnel were generally very slow to act or respond to inmate medical needs; due to inadequate staffing levels, facilities and procedures that do not allow for proper diagnosis and treatment, and rules or policies restricting medical care on grounds unrelated to the inmate's medical needs. As such, Plaintiff Aldrich made a point to respectfully emphasize the importance of his medications being reviewed and approved as soon as possible and for him to be seen by a physician from CPS as soon as possible. Which Defendant Debra Smith, RN responded to with assurances that she would personally expedite the medication review process in place at ACJ by CPS to have a provider approve Plaintiff's prescribed antibiotics and refer Plaintiff to be seen by a CPS medical provider as soon as possible.

24. Upon information and belief, Defendant Debra Smith, RN failed to ever submit any

request for a CPS medical provider to review or approve those prescribed antibiotic medications that Plaintiff Aldrich arrived to ACJ with from Rockingham County Jail, despite her knowing that Plaintiff had MRSA.

25. Defendant Debra Smith, RN, upon information and belief, also failed to ever submit a referral for Plaintiff Aldrich to be seen and examined by a CPS medical provider, despite her knowing that Plaintiff Aldrich had MRSA and was not receiving his prescribed antibiotics.

26. Defendant Debra Smith, RN, upon information and belief, also failed to ever submit or otherwise process either of those medical release forms authorizing ACJ and CPS medical personnel to specifically obtain Plaintiff's medical records about his MRSA diagnosis and treatment, despite her again knowing that Plaintiff had active MRSA infection that required treatment with prescription medications and that both RCJ and CMMC had essential records pertaining to such diagnosis and medical history.

27. Upon information and belief, Defendant Debra Smith is a Registered Nurse who is licensed by the State of Maine Board of Nursing and has several decades of nursing experience. That being said, Defendant Debra Smith, RN knew, or reasonably should have known, that her failure to take necessary reasonable steps to ensure that Plaintiff Aldrich received his prescribed antibiotic medications that he came from RCJ to ACJ with to treat his active MRSA infection and her failure to refer Plaintiff to be examined by a CPS medical provider for his active and untreated MRSA, would have or otherwise cause severe and potentially life-threatening consequences for Plaintiff's health and well-being.

28. As a result of the aforesaid acts and omissions by Defendant Debra Smith, RN

Plaintiff Aldrich went approximately ___ weeks without receiving his (or any other) prescribed antibiotic medications and without ever being seen or examined by a qualified CPS medical provider despite having an active MRSA infection. Which consequently allowed Plaintiff's MRSA infection to progress and worsen from a mere soft-tissue infection to an extremely serious and complex bone infection that resulted in wide-spread bone and joint destruction and degenerative changes and even forced Plaintiff to undergo surgery for digital amputation to contain the consequent bone infection.

29. From approximately 3/9/2023 through 3/22/2023, Plaintiff Aldrich submitted numerous sick-call slips to CPS medical staff complaining of:

    a.) Not receiving his prescribed antibiotic medications for his MRSA infection that he came to ACJ with from Rockingham County Jail.

    b.) Plaintiff's MRSA infection appearing to be worsening due to him not receiving his prescribed medications.

    c.) Plaintiff suffering severe and debilitating pain from in and around his left hand

30. On or about 3/10/2023, Plaintiff Aldrich submitted his first sick-call slip to CPS medical staff that stated ver batem: I have a serious MRSA infection on my left hand and am not receiving the prescribed antibiotic medications that I came to ACJ with [from Rockingham County Jail].

31. On or about 3/12/2023, Plaintiff Aldrich submitted another sick-call request to CPS medical staff stating the same as noted above and requested that he be seen by a medical provider "ASAP" for his "MRSA infection," as he was very concerned that his infection would get worse if he did not receive any medical treatment.

32. Plaintiff Aldrich submitted so many sick call slips and other requests for adequate medical care and treatment for his active and largely untreated MRSA infection and consequent pain and suffering that by providing the details and specifics of each and every instance would simply be too numerous to list in their entirety here, but to which Plaintiff Aldrich will testify to at the time of trial, and to which defendants are collectively put on notice of hereby above.

32(b) On or about 3/22/2023, Plaintiff Aldrich was finally seen by CPS nursing staff in response to his sick-call slips requesting to be seen by a medical provider immediately and for him to be provided the prescription antibiotics that he came to ACJ from RCJ with. CPS nursing staff told Plaintiff that they would

33. From approximately 3/9/2023 through 3/22/2023, Plaintiff Aldrich repeatedly complained to numerous ACJ staff about CPS medical staff failing to provide him with his prescribed antibiotic medications for an active MRSA infection that he came to ACJ with from RCJ and how CPS medical staff had failed to have him seen by a medical provider despite Plaintiff having an untreated MRSA infection that appeared to be worsening.

34. Again, as stated above about those sick-call slips submitted by Plaintiff Aldrich, Plaintiff also complained to so many ACJ staff and officials about Defendant CPS's failure to provide him with prescribed medications or any care whatsoever for his MRSA infection or consequent pain and suffering that by providing the details and specifics of each and every instance would simply be too numerous to list in their entirety here, but to which Plaintiff will also testify to at the time of trial, and to which defendants are collectively put on notice of.

35. Plaintiff Aaron Aldrich was finally examined by Julie Gerow, NP (a medical provider from CPS) on or about 03/22/2023, in response to Plaintiff's numerous sick-call slips and other requests to be seen about his worsening MRSA infection.

36. Plaintiff Aldrich reiterated to Nurse Practitioner Gerow that he had been diagnosed with MRSA back in February 2023 and that he had been sent to ACJ (from Rockingham County Jail in New Hampshire) with prescription antibiotics for MRSA.

37. Ms. Gerow told Plaintiff that she was very confused as to why he had not been provided the prescription antibiotics that he came to ACJ with from RCJ and why it took so long for Plaintiff to finally be seen by a medical provider.

38. Ms. Gerow then examined Plaintiff's left hand and immediately suspected Acute Pyogenic Osteomyelitis based upon information and belief that Plaintiff's hand was very obviously and visibly severely infected (e.g. pockets and pouch filled puss nodules, severe swelling, redness, extreme deep rooted pain, extremely diminished range of motion, etc).

39. Ms. Gerow ordered that Plaintiff be evaluated for osteomyelitis, which workup included an x-ray of Plaintiff's hand.

40. Plaintiff's left hand was x-rayed on or about 03/23/2023 and those films were noted to be "suspicious for osteomyelitis..."

41. On or about 03/22/2023, CPS medical staff finally requested and obtained Plaintiff's medical records from RCJ and CMMC. Which medical records showed Plaintiff's MRSA infection diagnosis, treatments received, etc. Moreover, those records

showed that RCJ medical staff had by chance performed x-rays of Plaintiff's left hand just days prior to Plaintiff's extradition back to Maine and transfer to ACJ and those x-rays positively ruled out any evidence whatsoever of a bone infection.

42    As such, Plaintiff's own medical records very clearly demonstrate through objective medical evidence that Plaintiff's bone infection was proximately caused by the defendants' failure to provide Plaintiff Aldrich with his prescribed antibiotic medications and by defendants' failure to provide Plaintiff timely access to medical care and treatment.

43 . On or about 03/29/2023, Julie Gerow, NP scheduled an Emergency Room visit at CMMC for Plaintiff to receive a full diagnostic workup and evaluation for his suspected osteomyelitis.

44 . On or about 03/30/2023, Plaintiff was brought to CMMC by ACJ security staff and underwent said evaluation for osteomyelitis. Plaintiff was discharged by CMMC physicians to ACJ's custody with clear instruction to have Plaintiff seen by outpatient orthopedic surgeon within "2 weeks" and for Plaintiff to be returned to CMMC for "increasing pain, redness, swelling, fever, or any new or worrisome symptoms."

45 . On or about 04/11/2023, Plaintiff Aldrich was brought to Central Maine Orthopedics were he was examined by William F. Zimmerman, MD by ACJ security staff. At which time, Dr. Zimmerman asked the ACJ transport officers if they could remove Plaintiff's left hand from restraints so he could properly and fully examine Plaintiff's hand.

46 . Those ACJ transport officers refused to remove Plaintiff's one hand from restraints

claiming that ACJ had a policy or custom which prohibited the removal of an inmate's restraints for any reason, unless for emergency care and treatment at the hospital.

47. Plaintiff's orthopedic surgeon objected to such purported policy or custom and told the ACJ transport officers that he had treated many incarcerated patients from various correctional facilities across the state and had never been denied the ability to examine a patient's body due to a policy or custom prohibiting the removal of a restraint.

48. Upon information and belief, ACJ security staff could have removed Plaintiff's left hand from the restraint setup without compromising any legitimate penological interest or concern. Whereas Plaintiff was outfitted with what is referred to as "full four-point restraints" with belly chain securing his handcuffs and leg irons.

49. It should be noted that just 2 weeks or so prior, Plaintiff was brought to the emergency room at CMMC for an urgent diagnostic workup and while there was at times without any restraints whatsoever and other times secured with just plastic "zip ties." During which time Plaintiff obeyed all commands given to him by both ACJ transport officers and medical personnel and presented no safety concerns. While at CMMC, Plaintiff was permitted to have his hand unrestrained (during period restraints were on, such as while in waiting room) so Plaintiff could eat.

50. That being said, Plaintiff's orthopedic surgeon was needlessly denied necessary access to Plaintiff's left hand to perform an adequate examination, because of ACJ's purported policy or custom that restricts the removal of an inmate's restraints for any reason while out on a "med trip," unless the inmate is at the hospital. Which aforesaid policy or custom is/was applied without ACJ staff inquiring into the specific facts and circumstances of Plaintiff's case.

51. As a result, Plaintiff's orthopedic surgeon was forced to formulate his medical opinion for the best course of care and treatment, inter alia, for Plaintiff's left hand without having the opportunity to provide a full and unencombered examination, due to those restraints being kept on and the significant restrictions of access and mobility that are caused by such restraints.

52. Despite the aforesaid issue, Plaintiff's orthopedic surgeon proceeded the best he could under the circumstances and explained to Plaintiff that his initial MRSA infection had went from a soft tissue infection to a "very serious" bone infection that was actively destroying Plaintiff's bones.

53. Plaintiff's orthopedic surgeon then presented Plaintiff with his two recommended options for care and treatment. The first option consisted of empirocal IV antibiotics for several months, which required Plaintiff to have access to to timely and adequate medical care and very comprehensive follow-up care to closely monitor the underlying bone infection. Which option for care and treatment would have been Plaintiff's orthopedic surgeon's first choice for how they should proceed, but Plaintiff's orthopedic surgeon voiced grave concerns that he had about Defendants, and other medical staff at ACJ, not being able to provide Plaintiff with even minimally adequate and timely medical care and treatment and pointed out that their incompetence and inactions were the reason that Plaintiff had even acquired his underlying bone infection in the first place.

54. Plaintiff's orthopedic surgeon then went on to reluctantly recommend digital amputation as their "best option under the circumstances" and further explained that he did not believe that Defendants, and other medical staff at ACJ, were capable of providing Plaintiff the necessary care and treatment required for the non-surgical option. Which opinion, was

based in large part on Plaintiff's orthopedic surgeon's own observations and assessments of Defendants', and their employees and agents', grossly inadequate and untimely medical care and treatment received to date and which acts and omissions that Plaintiff's surgeon believed to have caused Plaintiff's consequent bone infection.

55. Plaintiff's orthopedic surgeon further explained that Plaintiff's underlying bone infection was "very serious" and needed "immediate care and treatment" to stop the spread of infection to other bones and to minimize the amount of destructive and degenerative changes caused by such infections. Plaintiff's orthopedic surgeon also explained that the surgical amputation option would benefit Plaintiff in the sense that he wouldn't be as reliant on competent and timely medical care from the Defendants, whereas the proceedure would effectively cure the underlying bone infection by exision and removing the infected portions of bone.

56. Plaintiff was completely shocked at the news and prospect of potentially having to have his finger amputated in order to get rid of the consequently acquired bone infection as a result of Defendants' deliberate indifference to Plaintiff's serious medical needs.

57. Plaintiff then asked his surgeon if he could have a couple days to make such a big decision and consider all of the ramifications. Plaintiff's surgeon said that Plaintiff could have some time to decide, but strongly cautioned Plaintiff not to delay too much, because the bone infection was "already very serious."

58. Plaintiff then thanked his surgeon and left that appointment. While in route back to the jail, Plaintiff ultimately decided to proceed with the digital amputation option, because he (like his surgeon) did not believe that the Defendants, and their employees

and agents at ACJ, would actually provide the medical care and treatment ordered and/or do so in a timely manner. As such, Plaintiff Aldrich felt as though the surgical route was his only option to cure the underlying bone infection he had acquired as a result of Defendants' deliberate indifference to his MRSA infection.

59. Plaintiff immediately notified both ACJ staff and CPS medical personnel upon his arrival back to the jail from that orthopedic consult appointment. CPS nursing staff assured Plaintiff that they would inform his orthopedic surgeon of Plaintiff's decision.

60 Also, once back at ACJ from that appointment, Plaintiff saw Defendant Lane Feldman in the intake area of the jail and Defendant Feldman said in a sarcastic tone: "Well, looks like it wasn't that bad, because you still have your finger." At which time, one of the transport officers interjected and said: "Actually Captain, they are going to have to amputate his finger." Which Captain Feldman responded: "Oh, well..." and then walked away.

61 Upon information and belief, Defendant Lane Feldman's statements and sarcastic tone during the aforesaid interaction amply evince the gratuitous disregard and deliberate indifference that he, and other jail administrative staff, had toward Plaintiff's, and other inmates', serious medical needs.

62 Defendant Lane Feldman was charged with the duties of reviewing inmate complaints about medical care received while at ACJ, inter alia. Defendant Feldman routinely dismissed such complaints which alleged systemic deficiencies in the medical care system at ACJ without sufficient, or even any, investigations at times. Including the complaints filed by Plaintiff alleging inadequate and untimely medical care and treatment for serious medical needs.

63. From approximately 3/9/2023 through 12/29/2023, Plaintiff Aldrich filed in excess of 10 complaints with Defendant Lane Feldman, complaining of the continued and ongoing deliberate indifference endured and suffered to serious medical needs by CPS medical staff. Which Defendant Feldman responded that ACJ contracted the medical care to CPS and had no say over any medical issue.

64. Following Plaintiff's initial orthopedic consult on or about 4/11/2023, Plaintiff began inquiring about the status of his surgery being scheduled after several weeks had passed.

65. Plaintiff was worried about the delay in CPS medical staff scheduling his surgery based on the medical advise provided by his surgeon at his consult appointment.

66. Plaintiff found out through jail and medical staff that Defendant Wendy Riebe was who was responsible for the scheduling of Plaintiff's surgery, but still had not bothered to schedule the procedure despite several more weeks passing.

67. Finally, nearly 2¼ months later, Plaintiff was brought to CMMC for his digital amputation proceedure. However, Plaintiff's orthopedic surgeon was not pleased with the delay in Defendants scheduling Plaintiff's surgery, whereas that delay of several months had allowed Plaintiff's bone infection to get even worse and required more surgical exision of bone and infected tissue than had been initially planned.

68. As a result of Defendant Wendy Riebe's failure to timely schedule Plaintiff's surgery, Plaintiff lost more bone and tissue than would have been required had his surgery been scheduled within the 1-2 week period requested by Plaintiff's surgeon.

69. Plaintiff's orthopedic surgeon performed the digital amputation proceedure of Plaintiff's left middle finger. Which procedure was unremarkable, aside from Plaintiff's surgeon having to exise more bone and tissue than initially planned for.

70. Following the surgery, Plaintiff was discharged from CMMC to ACJ with very clear post-surgery instructions for wound care and necessary prescriptions for pain medication and antibiotics.

71. When Plaintiff got back to ACJ he was informed by nursing staff that Defendant Wendy Riebe, HSA had denied the pain medication ordered for Plaintiff, because that medication was prohibited from being prescribed to any inmate at ACJ for any reason pursuant to a blanket policy or custom.

72. Nursing staff told Plaintiff that they would try to work on getting him an alternative pain medication and would get back to him soon.

73. Plaintiff's orthopedic surgeon had also ordered "ice compresses" for pain modulation and to help with the swelling. Which Plaintiff inquired about too, but was also unable to receive due to Defendant Wendy Riebe failing to approve such order.

74. For the first few days following Plaintiff's amputation of his left middle finger, he was denied any pain medication or ice compresses. As a result, Plaintiff suffered excruciating and severe pain. (with exception of one or two ice compresses being provided to Plaintiff by CPS nursing staff on the first day following his surgery).

75. Finally, on or about 5/26/2023, Plaintiff was provided one of only three Tramadol injections that Defendant Wendy Riebe, HSA allowed the medical provider to prescribe Plaintiff for his pain owing to his recent amputation of a finger.

76. Which Tramadol muscular injection was prescribed by a CPS medical provider and supposed to serve as "substitute" for that pain management medication ordered by Plaintiff's surgeon (Percoset 10 mg PRN for 7 days), but was not at all an adequate medication alternative under the circumstances, nor prescribed enough to actually relieve Plaintiff's severe post-surgical pain.

77. Defendant Wendy Riebe, HSA told Plaintiff that she did not believe that the amputation of his finger warranted any pain medication at all, claiming that she had done "research" on the topic and supposedly was advised of such rediculous claims. However, Defendant Riebe said that she would reluctantly allow CPS medical providers to prescribe Plaintiff 3 Tramadol shots and told Plaintiff to use them "sparingly" and "wisely."

48. First and foremost, Defendant Wendy Riebe is/was merely a registered nurse and is/was not qualified to be making such medical judgments or decisions. Defendant Wendy Riebe, HSA was effectively practicing medicine by making those medical judgments and decisions.

79. Upon information and belief, Defendant Wendy Riebe was the Health Services Administrator for CPS at ACJ and had supervisory authority over medical staff and personnel, including physician staff and other medical providers. Defendant Wendy Riebe used her position as HSA to essentially practice medicine and make medical decisions and judgments that she was not qualified to do. Which resulted in Plaintiff being deprived of adequate pain medication and Plaintiff's consequent suffering severe pain following the amputation of his finger.

80. Moreover, Defendant Wendy Riebe, HSA was responsible for ordering ice compresses ahead of Plaintiff's surgery, but outright failed to do so. Nor did she bother to even

order such necessary ice compresses at any relevant time that Plaintiff was supposed to receive them "PRN" (as needed) as ordered and prescribed. As a result, Plaintiff Aldrich was denied ice compresses from CPS medical staff following his surgery to amputate his finger and was unable to receive even a single ice compress from medical staff. Which significantly impeded Plaintiff's ability to manage his severe pain.

81. Plaintiff was further forced by Defendants to ration his 3 allotted pain medication shots and specifically warned to use them "sparingly" and "wisely" by Defendant Wendy Riebe, as she would not allow any additional pain medications to be ordered or provided to Plaintiff for any reason.

82. As such, Plaintiff did not dare to actually take the pain medication prescribed as and when needed, and instead forced himself to tolerate the severe pain that he was suffering. Plaintiff worried that if he used the pain medication as and when actually needed, it would require him to receive one of his three allotted shots at least once per day. Which would have only lasted him the first 3 days.

83. However, it should also be noted that although Plaintiff was told that he could receive up to 3 Tramadol intramuscular injections "as needed" for his severe pain; Plaintiff was not actually even afforded the opportunity to receive his pain meds when he asked for them due to the ongoing and repeated instances of systemic deficiencies in medical care and treatment by CPS medical staff and defendants.

84. Plaintiff received his first Tramadol shot on or about 5/26/2023, but was not able to receive his next Tramadol shot until approximately 3 days later, despite him being in severe pain and making several requests for such shot to CPS staff on

each of those 2-3 prior days.

85. Further, Plaintiff Aldrich was unable to receive his third allotted and prescribed Tramadol shot at all, despite making numerous requests for such medication for his ongoing and severe pain.

86. All of Plaintiff's requests for his third allotted and prescribed Tramadol shot went unanswered

87. Defendants' failures and refusals to provide Plaintiff with the full course of pain medication prescribed by CPS medical providers constitutes deliberate indifference to Plaintiff's severe pain and serious medical needs.

88. Defendants first failed to provide Plaintiff with any pain medication whatsoever (despite his surgeon ordering Percoset 10 mg PRN for 7 days) for the first 3 days following his surgery to amputate his finger; Defendants then finally agreed to provide a substitute pain medication, but forced Plaintiff to ration his doses of that pain medication to span the week or two that he would likely need it; then Defendants repeatedly deny Plaintiff access to his medication when he requests his second dose — which second dose ultimately takes 2-3 more days for Plaintiff to finally receive; then Defendants completely deprive Plaintiff of his third pain medication shot altogether despite Plaintiff requesting to be provided that shot each and every day.

89. Defendants refused to provide Plaintiff with even ice compresses', despite those being ordered. A correctional officer was so disgusted by the complete and utter disregard of Plaintiff's pain and suffering by Defendants, that she took it upon herself to go to the facility's kitchen and get a bag of ice for Plaintiff on one occassion.

90. Defendants tasked CPS nursing staff with tending to Plaintiff's "wound care" following his surgery. Which wound care needs required Plaintiff's bandages be changed at least once every 24 hours and wound cleaned during bandage changes. However, CPS nursing staff were unable to provide Plaintiff with even minimally adequate wound care due to rampant understaffing by Defendants and incompetence.

91. Plaintiff Aldrich experienced the following issues post-surgery:

a.) CPS nursing staff failed to perform each and every wound care visit as prescribed and ordered (at least once per 24 hour period) by Plaintiff's orthopedic surgeon. Which reasonable discovery will allow Plaintiff to ascertain each specific instance of the aforesaid failure to perform his wound care needs.

b.) CPS nursing staff would also often rush and cut-corners when performing Plaintiff's wound care. For instance, there were times when CPS nursing staff performed Plaintiff's bandage changes in unsanitized non-medically designated areas of the jail (such as; visit rooms, etc) instead of the medical unit out of convenience. Which required Plaintiff to place his open wounds on and around uncleaned surfaces.

c.) CPS nursing staff also would re-use bandage wraps because they "forgot" to bring new and unused bandages and wraps when performing Plaintiff's wound care visits outside of the medical unit.

92. As a result of the foregoing acts and omissions, Plaintiff acquired yet another soft-tissue infection at the site of his wounds. Which caused Plaintiff to suffer even more pain and suffering, and needlessly worsened Plaintiff's prognosis. Moreover, this newly acquired soft-tissue infection required Plaintiff to have to receive even more antibiotics. Which repeated antibiotic exposures ultimately left Plaintiff nearly antibiotic resistant and probiotic dependent.

93. Reasonable discovery will allow Plaintiff the opportunity to ascertain necessary medical records and other security logs or documents that will show each and every instance that CPS nursing staff failed to provide wound care for Plaintiff Aldrich as prescribed (e.g; at least once per day or 24 hours), cut corners and performed Plaintiff's wound care in unclean and non-sterile common areas of the jail (instead of in the medical unit as required), and forced Plaintiff to re-use old bandages, wraps, or other medical supplies.

94. As a result of Defendants', and their employees and agents, failure to provide adequate, timely, and at times necessary wound care as ordered and prescribed by Plaintiff's surgeon, Plaintiff acquired yet another (soft-tissue) infection and needed to be put on more antibiotics.

95. Approximately 2-3 weeks after Plaintiff's surgery, Defendants brought Plaintiff to his orthopedic surgeon for a follow-up visit. Plaintiff's surgeon was disgusted by CPS medical staff's continued gross negligence and deliberate indifference toward Plaintiff's serious medical needs, as described above, especially because their gross negligence and deliberate indifference had caused Plaintiff to acquire yet another infection.

96. Upon information and belief, the newly acquired infection could have caused extreme complications to Plaintiff's health and well-being, and could have needlessly prolonged his post-surgery healing of wounds.

97. Plaintiff's orthopedic surgeon made some additional treatment and post-surgery care instructions for Plaintiff and specifically requested at least 2 more follow-up visits to presumably more closely monitor Plaintiff's healing while in the custody, care, and control of Defendants.

98. Plaintiff's surgeon provided Plaintiff Aldrich with medical supplies (e.g.; gauze, pads, etc) to properly wrap and cushion his wound and nearby remaining fingers to minimize the pain he was experiencing and aggravating factors.

99. Plaintiff was only able to use those necessary medically supplies once, whereas ACJ staff took them from Plaintiff's cell without inquiring about how Plaintiff had obtained them or why they were even in Plaintiff's possession.

100. At Plaintiff's first post-surgical follow-up appointment, Plaintiff's orthopedic surgeon also prescribed Plaintiff with Gabapentin 300 mg TID initially and to be increased to 1,200 mg TID over a period of several weeks. However, upon being returned to ACJ, Plaintiff was informed by Defendant Wendy Riebe, HSA that there was a blanket-policy prohibiting that medication from being prescribed to any inmate for any reason.

101. Plaintiff informed Defendant Wendy Riebe that his surgeon had believed that the medication was medically necessary due to Plaintiff's nerve damage resulting from a severed nerve after undergoing the amputation procedure.

102. Defendant Wendy Riebe told Plaintiff that she would not authorize any CPS medical provide to actually order that medication for Plaintiff no matter what.

103. It should also be noted that post-surgery, Plaintiff was denied any and all access to antibiotic ointments and anti-bacterial soap to practice and maintain adequate hygiene. Which denial of those necessary items by Defendants were not based on any legitimate or reasonable penological need.

104. At Plaintiff's next orthopedic surgeon follow-up appointment, Plaintiff informed his surgeon that Defendant Wendy Riebe had refused to allow a provider to order the medication

prescribed by his surgeon for severe nerve damage resulting from a severed nerve during the amputation of Plaintiff's finger.

105. Which nerve damage was causing Plaintiff severe discomfort and significant pain at times. Plaintiff mostly experienced severe tingling sensations, that interrupted his ability to sleep, concentrate, or engage in hobbies or past-times previously enjoyed (such as; drawing, sketching, painting, etc).

106. Plaintiff's orthopedic surgeon was again very disgusted by the apparent ongoing and continued denials of necessary medical care and treatment to Plaintiff by the Defendants, that he made a point to write a letter to Defendant Wendy Riebe, HSA and asked that ACJ transport officers ensure that she received it. Which letter, inter alia, specifically explained the medical need for the ordered Gabapentin, and requested that it be provided to Plaintiff.

107. Following this follow-up appointment, Defendant Wendy Riebe, HSA said that she would reluctantly approve the medication ordered by Plaintiff's surgeon.

108. Around this time, Plaintiff also met with Defendant Wendy Riebe, HSA in response to his complaints and grievances for inadequate and untimely medical care and treatment.

109 Defendant Wendy Riebe, HSA became enraged and verbally abusive toward Plaintiff Aldrich when he respectfully disagreed with her version of events and attempts to justify her and the other defendants' gross negligence and deliberate indifference to Plaintiff's serious medical needs.

110. Defendant Wendy Riebe, HSA rolled her chair so she was positioned in front of Plaintiff while screaming at him. She was so close to Plaintiff's face and enraged, that her spittle was hitting Plaintiff's face while screaming in his face.

111. Because Plaintiff refused to not abandon his complaints and grievances about Defendants, Defendant Wendy Riebe, HSA instructed a "psych provider" to suddenly discontinue Plaintiff Aldrich's order for Suboxone (based merely on purported "rumors" that Plaintiff had been diverting that medication). When ACJ policy required that an inmate actually be caught or found guilty of such medication diversion prior to such serious action or consequences being imposed.

112. Plaintiff filed a complaint and grievance about the aforesaid retaliatory conduct by Defendant Wendy Riebe, HSA. Which ACJ staff designated Defendant Wendy Riebe, HSA as the staff member to respond to Plaintiff's complaint and grievance.

113. While meeting with Defendant Wendy Riebe, HSA to discuss the aforesaid complaint and grievance, Plaintiff informed Ms. Riebe that he had never been caught or found guilty diverting his suboxone 3 times as required in order for such drastic measures to be taken. Which information was confirmed by the corrections officer present.

114. Defendant Wendy Riebe, HSA then said: "Well, too late now..." and "The order's already been canceled."

115. Plaintiff Aldrich asked Defendant Wendy Riebe, HSA if she could please notify the "psych provider" of Ms. Riebe's alleged error and fix the purported mixup. But, Defendant Riebe said "No," and smirked at Plaintiff.

116. Plaintiff Aldrich was engaging in protected conduct when filing those aforesaid complaints and grievances about the Defendants.

117. Defendant Wendy Riebe, HSA wrongfully and unlawfully subjected Plaintiff Aldrich to retaliation for his filing of those complaints and grievances about Defendants' gratuitously and wanton deliberate indifference to Plaintiff's serious medical needs; by discontinuing Plaintiff's prescribed Suboxone medication without any cause or justification for taking such action, other than to retaliate against Plaintiff for engaging in protected conduct.

118. Further, and upon information and belief, after Plaintiff Aldrich served Defendants with a Notice of Claim notifying Defendants of Plaintiff's intent to pursue legal claim for the events that give rise to this lawsuit, Defendants Wendy Riebe and Debra Smith attempted to change, alter, and modify Plaintiff's medical records in an obvious effort to conceal their wrongdoing and deliberate indifference to Plaintiff's serious medical needs.

119. Which conduct by Defendants Wendy Riebe and Debra Smith, includes but is not limited to their attempts to remove several pages from Defendant Debra Smith's "intake medical screening" performed on Plaintiff by Debra Smith upon Plaintiff's arrival to ACJ from Rockingham County Jail and which record amply evinces Plaintiff's claim that he repeatedly informed ACJ and CPS staff of his MRSA infection upon arriving at ACJ, and which removal or alteration of Plaintiff's medical record to intentionally conceal that evidence constitutes spoliation of Evidence.

120. Reasonable discovery will further show that Defendant Wendy Riebe subjected Plaintiff Aldrich to unlawful retaliation for filing complaints and grievances. Moreover, reasonable discovery will also amply evince Plaintiff's spoliation of evidence claim.

DEFENDANTS DEBRA SMITH, RN AND WENDY RIEBE, HSA WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS

121. Defendant Debra Smith, RN performed an intake medical screening on Plaintiff Aldrich as he was booked into ACJ

122. Plaintiff Aldrich promptly notified Defendant Smith that he had an active MRSA infection on his ring finger on his left hand. Plaintiff also told Defendant Smith that he had just came to ACJ from a jail in New Hampshire and had been transferred with a prescription for necessary antibiotics to treat his MRSA infection.

123. Rockingham County Jail had transferred Plaintiff to ACJ with an active prescription for prescription antibiotics, which documentation and physicians orders were provided to ACJ and CPS upon Plaintiffs arrival to ACJ.

124. Thus, Defendant Debra Smith, RN had no legitimate reason not to ensure that Plaintiff Aldrich was able to continue receiving his antibiotic medication for his active MRSA infection that she was made aware of by both the Plaintiff himself and the documentation sent with Plaintiff from the prior jail he had been sent to ACJ from.

125 Defendant Debra Smith, RN failed to ever take even minimal action to ensure that Plaintiff received medical care and treatment for his now at this point untreated MRSA infection, whereas she failed to ensure that he received those prescribed medication antibiotics or was seen by a medical provider.

126 From March 9, 2023 through March 22, 2025, Plaintiff Aldrich went without any medical care and treatment whatsoever for his MRSA infection, despite submitting numerous sick call requests complaining of worsening signs of infection and pain.

127. Nearly 2 weeks passed before the Defendants, and their employees and agents, finally arranged for Plaintiff Aldrich to be examined by a medical provider at ACJ in response to Plaintiff's many sick call slips submitted since his arrival on 03/19/23.

128. Each of Plaintiff's sick call slips were indicative of an urgent and serious medical need and repeatedly begged and pleaded for some sort of medical care and treatment for his worsening MRSA infection.

129. By the time that Plaintiff was finally seen by the medical provider at ACJ in response to his sick call slips, it was already too little too late, whereas Plaintiff's MRSA infection had progressed from a soft-tissue infection to a very serious and potentially life-threatening bone infection with extremely destructive and degenerative capabilities, due to:

    a.) The needless and unnecessary discontinuation of Plaintiff's prescribed antibiotics upon his intake at ACJ and failure of Defendant Debra Smith, RN to take any action whatsoever to ensure that Plaintiff Aldrich received his antibiotics for his known diagnosis of a MRSA infection.

    b.) The unsanitary and crowded environment at ACJ.

    c.) ACJ Defendants failure and refusal to provide Plaintiff with antibacterial soap or any other means to keep his infected finger clean and free of further contaminates.

130. The unduly and needless delay in having Plaintiff seen by a medical provider despite Defendants, and their employees and agents, knowing or reasonably should have knowing about Plaintiff's disclosed MRSA infection.

140.) Which acts, omissions, policies, and procedures continued thereafter with instance-after-instance of textbook deliberate indifference to Plaintiff's serious medical needs by Defendants, and their employees and agents, as follows:

a.) Following the extremely untimely examination of Plaintiff by a CPS medical provider, a diagnostic workup was commenced to rule out acute pyogenic osteomyelitis. As such, Defendants sent Plaintiff to CMMC where emergency room physicians performed a battery of tests, which included comprehensive labwork and various imaging modalities. CMMC physicians discharged Plaintiff back to ACJ while awaiting those findings and results. Days later CMMC physicians contacted Defendants, and their employees and agents, and requested that CPS medical staff screen Plaintiff for endocarditis and reactive arthritis, to assist them in the diagnostic workup of Plaintiff. However, despite receiving those requests from CMMC physicians, Defendants failed to ever perform either of those tests.

b.) After Plaintiff's initial orthopedic consult, it took Defendant Wendy Riebe, HSA several months to finally schedule Plaintiff's surgery, despite Plaintiff's orthopedic surgeon specifically requesting that the procedure be performed within 1-2 weeks due to the severity of the underlying bone infection and consequent permanent bone damage it was causing Plaintiff to suffer with each passing day. Defendant Wendy Riebe, HSA needlessly prolonged and delayed the scheduling of Plaintiff's surgery for 3 months. Which, upon information and belief, Plaintiff Aldrich believes was intentionally done by Defendant Wendy Riebe, HSA, because Plaintiff had filed and voiced several grievances and complaints about Defendants' deliberate indifference to Plaintiff's serious medical needs.

(41) Reasonable discovery will show that during Defendants Debra Smith RN and Wendy Riebe's tenures at ACJ (employed by Correctional Psychiatric Services), there was a sudden and drastic increase in inmate complaints of inadequate medical care and treatment, which correlates to a demonstrable pattern of those specific defendants routinely denying and delaying necessary medical care to inmates at ACJ with serious medical needs.

(42) Reasonable discovery will further show that during those defendants' respective tenures, there was a significant increase in inmate deaths and other serious injuries/illnesses, due to the same examples of deliberate indifference to serious medical needs as alleged herein, by Defendants Debra Smith, RN and Wendy Riebe, HSA.

## THE JAIL ADMINISTRATIVE DEFENDANTS HAVE BREACHED THEIR DUTY TO PROVIDE ADEQUATE HEALTH CARE

143.) Defendants Eric Samson, Jeff Chute, and Lane Feldman (hereinafter referred to collectively as the "Jail Administrator Defendants") had a constitutional and statutory duty to provide adequate medical care to individuals detained at Androscoggin County Jail.

144. ). The Jail Administrator Defendants are required to be personally involved in the design and administration of the healthcare system at ACJ.

145.) The Jail Administrator Defendants cannot eliminate their own duties owed to Plaintiff Aldrich, and other detainees, merely by using Defendant Correctional Psychiatric Services to deliver that health care. West v. Atkins, 487 U.S. 42, 56 (1988) ("Contracting out prison [or jail] medical care does not relieve the State [or Municipality] of its constitutional duty to provide adequate medical treatment to those in custody, and it does not deprive the State's [or municipalities] prisoners of the means to vindicate their [constitutional] rights.

146). As evinced by the countless and repeated delays and denials of health care endured by Plaintiff Aldrich, the Jail Administrator Defendants have systemically violated their duties to ensure adequate health care was provided to Plaintiff. They failed to supervise the corporate Defendants (Defendants CPS, Wendy Riebe, Jorge Veliz, Debra Smith, and Beth Cheney) and failed to call for the termination of the contract that ACJ had with CPS for cause, as was merited by the systemic denial of necessary medical and specialized care and surgeries, and the well-documented pattern of meritless and lengthy delays in providing care to Plaintiff, and numerous other detainees.

147.) Reasonable discovery will show that during the same period in question, and the preceeding and proceeding 1 year, numerous other inmates confined at ACJ were denied necessary medical care and treatment for serious medical needs by the same CPS defendants, and those other inmates suffered bodily harm, worsened disease/infection, and even death. Which denials of medical care for Plaintiff, and other inmates, was pursuant to an informal policy or custom by defendants to cut costs and reduce expenses.

148.) The Jail Administrator Defendants are liable for failing to supervise the CPS defendants, which allowed a continued pattern of violating Plaintiff Aldrich's Fourteenth Amendment rights to the United States Constitution.

149.) Instead of undertaking an adequate investigation and remedying the glaring deficits, and systemic deficiencies described above, the Jail Administrator Defendants participated in consistently denying Plaintiff Aldrich adequate and timely health care for his serious medical needs. Moreover, the Jail Administrator Defendants are responsible for reviewing grievances filed by inmates concerning inadequate medical care and other rights violations. They denied grievance after grievance without investigating the fact and without requiring CPS defendants to provide the medical care that they are required to provide by the terms of their contract.

DEFENDANT CORRECTIONAL PSYCHIATRIC SERVICES ACTED WITH DELIBERATE INDIFFERENCE BY INTENTIONALLY DELAYING AND DENYING NECESSARY MEDICAL CARE AND TREATMENT FOR SERIOUS MEDICAL NEEDS

150.) Defendant Correctional Psychiatric Services ("CPS") voluntarily competed to win Androscoggin County Jail's health care contract and won the contract in or about
According to that contract, CPS was to provide healthcare services to the inmates confined at Androscoggin County Jail.

151.) Defendant CPS knew (or reasonably should have known) that running the correctional health care system at ACJ would require the hiring and retention of competent medical staff and administrative personnel, supervising and training those staff and personnel, and terminating those staff and personnel who systemically violated the rights of those persons receiving care and treatment at ACJ, inter alia.

152.) Pursuant to Defendants' healthcare services contract, Defendant CPS was required to recruit and maintain certain staffing levels to ensure that adequate health care services were available to those incarcerated at ACJ, regardless of the inmate's sentencing status.

153.) Defendant CPS wilfully disregarded the aforesaid "staffing matrix" provision of the health care services contract with ACJ, by routinely and intentionally understaffing medical and administrative personnel at ACJ during all times material and relevant. Defendant CPS had a custom or policy of intentionally and routinely understaffing necessary medical and administrative personnel at ACJ as a way to drastically reduce the costs and expenses that would have otherwise been incurred from the wages and salaries of having those necessary medical staff and administrative personnel.

154.) Defendant CPS also had an informal policy or custom of having nursing staff and other non-physician staff perform tasks that far exceeded the scope of their licensing, education, and training as another way to drastically reduce the costs associated with receiving such care and treatment from a physician or other qualified professional. Which instances include, but are not limited to: Defendant CPS permitting Defendant Wendy Riebe, RN (the former Health Administrator at ACJ) to make medical judgments and decisions about serious medical conditions and the treatments thereof; to prescribe or discontinue prescription medications for serious medical needs or mental health needs, and more as fully described above.

155.) Defendant Wendy Riebe, RN is merely a registered nurse and has no formal education, training, or licensing that would authorize her to perform those duties alleged herein. Defendant Wendy Riebe, RN used her title and position as Health Services Administrator of CPS at ACJ to regularly and routinely perform tasks that she knew (or reasonably should have known) far exceeded the scope of her training, education, and licensing as a nurse. Moreover, Defendant Riebe encouraged and invited other non-physician nursing staff at ACJ, such as Defendant Debra Smith, RN to also perform medical tasks that far exceeded her education, training, and licensing.

156.) As evinced by the systemic delays and denials of medical care experienced by Plaintiff Aldriff, and other inmates at ACJ, Defendant CPS systemically and blatently violated the contract terms and Maine law, as well as the Fourteenth Amendment to the U.S. Constitution.

157.) Defendant CPS understaffed the correctional health care system at ACJ by failing to hire necessary medical professionals. Defendant CPS lacked physicians, nurses, dentists, and countless other needed professionals, as is/was evinced by numerous job postings and notices of vacancies throughout the period in question.

158.) Defendant CPS failed to supervise the staff it did have and retained staff known to have violated the rights of inmates at ACJ, including the Plaintiff. As stated herein and more fully described above, Defendant CPS permitted nursing staff to regularly perform physician level tasks.

159.) Reasonable discovery is needed to establish the full extent of the lack of supervision and wrongful retention as well as the full extent of the profits made by Defendant CPS through its deliberate and systemic failure to supervise and failure to terminate staff for wrongful conduct or performing unqualified tasks.

160.) Defendant CPS routinely denied Plaintiff Aldrich, and other inmates at ACJ, with medically-necessary

specialist care. Reasonable discovery will show that Defendant CPS and others did so in concert as a way to increase the profitability of the contract that CPS had with ACJ to provide healthcare services at the jail.

161.) Defendants CPS and Wendy Riebe, RN (Health Services Administrator) engaged in the wrongful practice of denying meritorious medical grievances filed by Plaintiff Aldrich without sufficient, or sometimes any, investigation.

162.) In the correctional health care industry, the National Commission on Correctional Health Care ("NCCHC") is the primary accrediting agency. The NCCHC performs periodic, pre-announced audits of correctional facilities to ensure that each facility seeking accreditation meets the minimum, baseline criteria for accreditation.

163.) Upon information and belief, Defendant CPS was found to be out of compliance with such baseline standards for accreditation on multiple occassions throughout CPS' tenure as the correctional health care provider at ACJ. Reasonable discovery will show the full extent of those deficiencies and findings requiring "corrective action."

164.) Reasonable discovery is also needed to determine whether any CPS defendants named herein or ACJ staff or officials had any minority equity ownership in CPS, or stood to gain personally for financial or performance guarantees, indemnities or other buyer obligations, as is its practice.

165.) Reasonable discovery is further needed to establish the full extent of profits made by Defendant CPS, and its agents or employees, that are attributable to the deliberate and systemic understaffing of necessary medical professionals at ACJ during the period in question.

COUNT I: VIOLATION OF 42 U.S.C. § 1983 — DENIAL OF DUE PROCESS AND DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

Plaintiff Aaron Aldrich repeats and incorporates by reference all statements made above.

Defendant Debra Smith, RN exercised textbook deliberate indifference to Plaintiff's health by failing to take any follow-up action whatsoever after learning that Plaintiff had been transferred to ACJ (from Rockingham County Jail with an active prescription for antibiotics to treat Plaintiff's active MRSA infection, while performing Plaintiff "intake medical screening."

Defendant Debra Smith, RN knew or reasonably should have known that her failure to seek physician approval of Plaintiff's prescribed antibiotics for his active MRSA infection would result in Plaintiff not being provided that medication while at ACJ. Further, Defendant Debra Smith, RN knew or reasonably should have known that Plaintiff's active MRSA infection was a serious medical need that required prescription antibiotic treatment or would otherwise worsen and spread and could pose a significant hazard to Plaintiff's health.

Defendant Debra Smith, RN also knew or reasonably should have known that ACJ and Centers for Disease Control guidelines required her, as a registered nurse, who performed Plaintiff's intake screening to ACJ, to report Plaintiff's active MRSA infection status to a physician at CPS and ACJ, at a minimum. Furthermore, ACJ and CPS policy required Defendant Debra Smith, RN to refer Plaintiff Aldrich to be seen by a qualified medical provider on an urgent basis, yet Defendant Smith failed to refer Plaintiff at all.

Defendant Wendy Riebe, HSA was the Health Services Administrator for CPS at ACJ and exercised deliberate indifference to Plaintiff Aldrich's serious medical needs by repeatedly and at times intentionally denying Plaintiff access to timely and/or adequate medical care and treatment for his MRSA infection and consequent serious bone infection, as follows:

a.) Defendant Wendy Riebe, HSA failed to ensure that Plaintiff's numerous sick call slips filed (about coming to ACJ with an active MRSA infection and concerns about signs/symptoms of worsening infection due to lack of medical care and treatment) were answered in a timely manner and addressed by qualified medical professionals.

b.) Defendant Wendy Riebe, HSA was responsible for maintaining adequate staffing to meet the healthcare needs of the inmates at ACJ, but failed to do so. Which resulted in Plaintiff having to wait several weeks to be seen and examined by a medical provider in response to Plaintiff's numerous sick-call and other complaints regarding his worsening MRSA infection and by the time Plaintiff was finally seen by the provider his soft-tissue infection had progressed to a very serious bone infection.

c.) Defendant Wendy Riebe, HSA intentionally delayed the scheduling of Plaintiff's surgical amputation procedure by nearly 2 1/2 plus months in retaliation for Plaintiff's complaints and grievances about him receiving grossly inadequate medical care and treatment while at ACJ. Which surgical procedure Defendant Wendy Riebe, HSA delayed needlessly and without any legitimate reason, while fully knowing that delaying such necessary procedure would only cause Plaintiff more pain and suffering.

d.) Defendant Wendy Riebe, HSA also intentionally failed and refused to order necessary and adequate pain medication or ice compresses to help modulate Plaintiff's severe pain after his surgery to amputate his left middle finger.

As a result of Defendant Debra Smith's and Wendy Riebe's deliberate indifference to Plaintiff Aldrich's serious medical needs, Plaintiff's initial MRSA (soft-tissue) infection was able to progress and worsen to a very serious bone infection that destroyed bone and affected joints in Plaintiff's hand and ultimately resulted in a completely preventable and entirely foreseeable amputation of Plaintiff's left middle-finger to cure and contain the underlying bone infection. Which incidents and events occurred over a period of approximately     months and caused Plaintiff to suffer severe and protracted physical pain and suffering, severe mental anguish, and permanent disfigurement and irreparable injury.

COUNT 11: VIOLATION OF 42 U.S.C. § 1983 - FAILURE TO PROVIDE ADEQUATE MEDICAL REMEDY; AND CPS DEFENDANTS' NEGLIGENT HIRING, SUPERVISION, AND RETENTION; AND SYSTEMIC DEFICIENCIES IN MEDICAL SYSTEM AT ACJ

Plaintiff Aldrich repeats and incorporates by reference all statements made above.

Defendants' negligent hiring, supervision, and retention harmed Plaintiff.

By the practices, policies, customs, and acts described herein, Defendants individually and collectively subjected Plaintiff Aldrich to serious harm and injury from repeatedly denying and delaying necessary medical care and treatment for Plaintiff's serious medical needs.

Defendants' conduct in needlessly and unreasonably denying and delaying necessary medical care and treatment for Plaintiff's serious medical needs, caused Plaintiff's initial soft-tissue MRSA infection to dramatically worsen to a very serious and potentially life-threatening bone infection that ultimately resulted in the amputation of one of Plaintiff's fingers, inter alia. Then, through sheer incompetence CPS nursing staff cause Plaintiff to acquire yet another infection from shoddy and negligent "wound care" practices after Plaintiff's digital amputation, which individually and collectively constitute

textbook deliberate indifference to serious medical needs; and caused Plaintiff severe and protracted pain and suffering, mental anguish, and permanent disfigurement, in violation of the 14th Amendment of the U.S. Constitution.

The Defendants' conduct was systemic and intentional, and was part of an overall strategic approach to maximizing profits by pursuing policies and practices that had the foreseeable effect of delaying and denying necessary health care in violation of inmates' rights. Defendants' conduct reflected a custom or policy of violating Plaintiff's, and others', constitutional rights.

Because of Defendants' deliberate indifference, Plaintiff has suffered severe and protracted physical pain and mental anguish, and will continue to suffer irreparable injury, including the preventable amputation of his finger, consequent loss of motor skills and dexterity, and severe emotional distress of losing a part of his body.

Plaintiff contends that even a lay person would reasonably know that a MRSA infection would require immediate prescription antibiotic medication and examination by a qualified medical professional. As such, the legal doctrine of Res Ipsa Loquitor would clearly apply to the facts and circumstances of this case.

As a result of CPS and medical defendants' gross negligence and gratuitous deliberate indifference to Plaintiff's serious medical needs, Plaintiff suffered irreparable injury.

COUNT III: SPOLIATION OF EVIDENCE CLAIM

Plaintiff Aldrich repeats all allegations above by reference in Paragraphs

Following the incidents alleged above and receipt of Plaintiff's Notice of Claim, Defendants Wendy Riebe, HSA and Debra Smith, RN, knowingly, intentionally, and purposefully changed, altered, and modified various parts of Plaintiff's CPS medical record, with knowledge that by doing so their actions would spoliation of significant and relevant evidence, imposing prejudice and undue burdens on the herein causes of actions. Plaintiff is therefore entitled to sanctions and damages as are permitted by law.

COUNT IV: RETALIATORY TREATMENT FOR FILING COMPLAINTS AND FILING GRIEVANCES

. Almost immediately after Plaintiff filed complaints and grievances about receiving woefully inadequate medical care and treatment for his serious medical needs by Defendants, Defendant Wendy Riebe repeatedly intentionally interferred with Plaintiff's medical care and treatment in retaliation for the complaints and grievances. Defendant Wendy Riebe purposely and needlessly delayed scheduling Plaintiff's surgery for nearly 2½ months when that procedure was supposed to occur within 1-2 weeks at most due to the severity of Plaintiff's serious underlying bone infection. Defendant Wendy Riebe also intentionally deprived Plaintiff of necessary pain medication and ice compresses following the amputation of Plaintiff's finger to inflict pain and suffering on Plaintiff. Defendant Wendy Riebe also demanded that the "Psych Provider" at ACJ discontinue Plaintiff's suboxone medication over purported mere rumors that Plaintiff was diverting his medication (when ACJ and CPS policy expressly required that an inmate be actually caught or found guilty of diverting such medication on 3 occassions in order for such action to be taken).

A few months later, after Plaintiff had filed complaints and grievances against Defendant Wendy Riebe, for the above-described incidents, Defendant Riebe met with Plaintiff and verbally harassed him in retaliation for Plaintiff's filing of his complaints and grievances. Defendant Riebe rolled her chair right in front of Plaintiff and got within inches of his face while verbally harassing and abusing Plaintiff. Defendant Riebe was screaming and spitting in Plaintiff's Face, due to her being so enraged and close in proximaty.

The aforesaid acts represent a pattern of events demonstrating intentional retaliation against Plaintiff by Defendant Wendy Riebe for filing complaints and grievances and have caused Plaintiff Aldrich further mental anguish as a result.

COUNT IX: VIOLATION OF 42 U.S.C. § 1983 - NEGLIGENT HIRING, SUPERVISION, AND RETENTION BY JAIL ADMINISTRATOR STAFF DEFENDANTS

. Each of the foregoing paragraphs is hereby incorporated by reference as if fully set forth.

. Defendants' negligent hiring, supervision, and retention harmed Plaintiff Aldrich.

. As described above, the Jail Administrator Defendants, by hiring Defendant CPS, acted with deliberate indifference to the risk that this profit-driven entity would violate the constitutional and statutory rights of the Plaintiff, Aaron Aldrich.

. As described above, the Jail Administrator Defendants, by failing to supervise Defendant CPS, acted with deliberate indifference to the risk that this profit-driven entity would violate the constitutional and statutory rights of Plaintiff Aldrich.

. As described above, the Jail Administrator Defendants acted with deliberate indifference to the risk Defendant CPS would violate the constitutional and statutory rights of the Plaintiff, Aaron Aldrich, when they retained Defendant CPS for the entire contractual period rather than exercising the contractual right to terminate for cause.

. Defendant Correctional Psychiatric Services acted with deliberate indifference to the rights of the Plaintiff, Aaron Aldrich, by hiring, failing to supervise, and retaining staff and personnel without the requisite competency in correctional medical services, including the retention of persons such as Defendants Debra Smith, RN and Wendy Riebe, HSA who had repeatedly violated Plaintiff's, and other inmates' rights

WHEREFORE, Plaintiff Aaron Aldrich respectfully requests judgment as follows:

1.) Compensatory damages against each defendant individually and collectively; in the amount of $1,000,000.00

2.) Punitive damages against each defendant as determined by a jury,

3.) Sanctions and other relief as determined just and proper.

Dated: Sept. 15 2025

Respectfully Submitted,

Aaron A. Aldrich

Aaron A. Aldrich, pro se
MDOC #
% Maine State Prison
807 Cushing Rd.
Warren, ME 04864

VERIFICATION

I, Aaron A. Aldrich, do hereby certify that I have read the foregoing Complaint and know its contents. All statements made therein are true to the best of my knowledge and recollection and those statements alleged upon information and belief are also true to the best of my knowledge and recollection.

Date: Sept. 15, 2025

Aaron A. Aldrich

Aaron A. Aldrich